# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Jason Tope,

        Plaintiff,

vs.

Joan Fabian, Commissioner of
Corrections; Health Services,
MCF-Stillwater; Lynn Dingle;
Dr. David Paulson, CMS; and
Maureen Conner, MCF-Stillwater;

        Defendants.        Civ. No. 09-0734 (DWF/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a special assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the Defendants' Motion to Dismiss, or for Summary

Judgment, and upon the Plaintiff's self-styled "Motion to Effect Service."  See,

Docket Nos. 31 and 41.  The Plaintiff appears pro se, and the Defendants Joan Fabian

("Fabian"), and David Paulson ("Paulson"), appear by Margaret E. Jacot, Assistant

Minnesota Attorney General. The Defendants Health Services, MCF-Stillwater ("Health Services"), Lynn Dingle ("Dingle"), and Maureen Connor ("Connor"), have not been served, and have not appeared in this action.[1] For reasons which follow, we recommend that the Defendants' Motion be granted, and that the Plaintiff's Motion be denied, as moot.

## II. Factual and Procedural Background

The Plaintiff is a State prisoner, who is currently incarcerated at the Minnesota Correctional Facility, in Lino Lakes, Minnesota ("MCF-Lino Lakes"). Upon a liberal reading of his pro se, verified Amended Complaint, and his other filings,[2] the Plaintiff

---

[1]The Plaintiff has advised the Court that he is unable to locate current addresses for Connor, and Dingle, in order to effect service, and so, he has moved the Court to voluntarily dismiss those Defendants. See, Motion to Effect Service, Docket No. 41, at pp. 1-2 of 2. As those Defendants have not been served with process in this action, and since there is no objection from the Defendants, we recommend that the portion of the Plaintiff's Motion to Effect Service, which seeks to dismiss Connor, and Dingle, be granted, but without prejudice. See, Rule 41(a)(1)(A)(I) and (a)(1)(B), Federal Rules of Civil Procedure.

[2]"Civil rights pleadings are construed liberally." Davis v. Hall, 992 F.2d 151, 152 (8th Cir. 1993); see also, Estelle v. Gamble, 429 U.S. 97, 106 (1976); Dasta v. LeBlanc, 132 Fed.Appx. 98, 100 (8th Cir., May 24, 2005)(the liberal reading should also include submitted exhibits). In addition, for purposes of the Summary Judgment Motion, the Plaintiff's verified Amended Complaint is the equivalent of a sworn Affidavit. See, Hanks v. Prachar, 457 F.3d 774, 775 (8th Cir. 2006), citing Roberson v. Hayti Police Dep't, 241 F.3d 992, 994-95 (8th Cir. 2001).

asserts a claim under Title 42 U.S.C. §1983, for a violation of his Eighth Amendment rights, and alleges that the Defendants failed to provide proper medical care for a serious infection in the bones of his left leg, which he developed before or after a surgery to remove several screws, which had been installed in 2001. See, <u>Amended Complaint, Docket No. 10</u>. The Plaintiff seeks damages, and an Order implementing practices that would be consistent with <u>Hines v. Anderson</u>, 439 F. Supp. 12 (D. Minn. 1977), or some other improved long-term care procedures for patients with chronic medical problems.[3] See, <u>Amended Complaint, Docket No. 10</u>, at pp. 3 and 7 of 10. The Plaintiff has sued the Defendants, here, in their individual and official capacities. <u>Id.</u> at p. 4 of 10.

In his Amended Complaint, the Plaintiff alleges that Paulson made an erroneous medical decision, on April 18, 2005,[4] by concluding that the Plaintiff's leg pain should

_____

[3]Our Circuit recently affirmed a District Court ruling which terminated the Consent Decree that had been adopted in <u>Hines v. Anderson</u>, 439 F. Supp. 12 (D. Minn. 1977). See, <u>Hines v. Anderson</u>, 547 F.3d 915 (8th Cir. 2008).

[4]The Exhibits that the Plaintiff has submitted demonstrate that Dr. Burkholder, who was the physician who examined the Plaintiff at MCF-Stillwater, recommended that he receive an orthopedic consult with respect to the metal hardware in his leg, but that the consult was denied on February 2, 2005, see, <u>Exhibit A, Docket No. 29</u>, at p. 2 of 24, and Paulson, who was not a consulting orthopedist, determined that the Plaintiff should not have his hardware removed, because there were no fractures or
(continued...)

be treated with ibuprofen, rather than surgery, and that, had the surgery been ordered at that time, a serious staph infection would have been uncovered.  Id. at p. 4 of 10. The Plaintiff maintains that the Defendants did not agree to undertake the surgery to remove the screws, which eventually took place on September 5, 2006,[5] until after the American Civil Liberties Union ("ACLU") sent a letter to Dingle, on July 5, 2006. Id. at pp. 4-5 of 10; ACLU Letter, Docket No. 29, Exhibit A, at pp. 19-20 of 24.[6]

As related in his Amended Complaint, after the surgery on September 5, 2006, the Plaintiff was transferred from the hospital to the MCF Oak Park Heights facility ("MCF-OPH"), for recovery, where, on September 15, 2005, the staff determined that the Plaintiff had developed an infection at the surgical site, and prescribed antibiotics.

---

[4](...continued)
shifting, id. at p. 8 of 24, after Paulson consulted with Dr. Burkholder some time on or before April 13, 2005.  Id. at p. 9 of 24.  As of August 4, 2006, more than a year later, the consultation had been approved, although the date of approval is not entirely clear.  See, Letter to ACLU, Docket No. 29, Exhibit A, at p. 21 of 24.

[5]The Complaint alleges that the surgery took place on September 5, 2005; however, that appears to be a typographical error, as the Plaintiff later refers to the surgery as having occurred on September 5, 2006, and the medical records, that the Plaintiff has submitted, also list September 5, 2006, as the date of that surgery.  See, Medical Reconciliation Form, Docket No. 29, Exhibit A, at pp. 23-24 of 24.

[6]The Plaintiff refers to the documents that are contained in Docket Entry No. 29 as "Exhibits A - C," however, the pages with in that Docket Entry are not labeled with Exhibit letters.  As a consequence, we refer to the entire Docket Entry No. 29 as "Exhibit A."

The Plaintiff alleges that, thereafter, he was transferred to MCF-Stillwater, and was never allowed to return to the hospital, for a follow up with his surgeon, after he was diagnosed with the infection, which the Health Services staff erroneously concluded was resolved. Id. at p. 5 of 10.[7]

The Plaintiff alleges that he began to feel a "deep itch," at the surgical site, soon after he was transferred back to MCF-Stillwater, and that he informed the Health Services medical staff, but that the staff took no action, and a "major abdomen illness" developed. According to the Plaintiff, he continued to experience the same symptoms for approximately two and one-half (2½) years, without receiving assistance from Health Services, despite numerous requests for treatment. Id. at pp. 5-6 of 10. As alleged in the Amended Complaint, the Plaintiff's leg swelled severely in April of 2008, at the surgical site, and Dr. Quanbeck, who was then working at MCF-Stillwater, delayed several days in obtaining x-rays, but ultimately diagnosed an "Osteo Myolitis Bone Infection," and ordered that the Plaintiff be taken to the hospital, where another surgery was performed, in order to remove a rod from the

---

[7]The medical records, that the Plaintiff has submitted, disclose that the orthopedic surgeon wrote on the discharge sheet that the Plaintiff did not need to follow up with the orthopedist, while the boilerplate language of that sheet informed the patient to contact the surgeon's office if he experienced problems. See, Discharge Sheet, Docket No. 29-1, Exhibit D, at p. 2 of 11.

Plaintiff's left leg. Id. at p. 6 of 10. The Plaintiff alleges that, after the second surgery, the seriousness of the infection necessitated a subsequent surgery, one week later, after which the Plaintiff remained at St. Joseph's Hospital for three (3) weeks. Id.

The Plaintiff contends that the infection, which he alleges developed before, or after, his surgery on September 5, 2006, and was eventually diagnosed in 2008, would have been avoided if the Defendants had provided proper follow-up care, and that Fabian, who is the Commissioner of the Minnesota Department of Corrections, and Paulson, who is the Department of Corrections Medical Director, are responsible for that failure, as it occurred "under [their] direction." Id. at pp. 6-7 of 10. In addition, reading the Plaintiff's pleadings liberally, he alleges that Paulson failed to take reasonable action, in April of 2005, by continuing to treat the Plaintiff's leg pain with ibuprofen, rather than referring the Plaintiff for surgery, and that all of the Defendants violated the Plaintiff's right to be free from cruel and unusual punishment, under the Eighth Amendment.[8]

---

[8]By way of additional background, the Plaintiff's Exhibits demonstrate that the Plaintiff was seen by Dr. Stephen Craane, at MCF-OPH, on September 6, 2006, see, DOC Medical Record, Docket No. 29-1, at p. 6 of 11, on September 7, 2006, id. at p. 8 of 11, and, upon his examination on September 11, 2006, Dr. Craane ordered laboratory and radiologic studies, and recommended a change in the antibiotic to be administered, to one that was more potent against drug-resistant infections. Id. at p.

(continued...)

9 of 11. The next day, Dr. Craane examined the Plaintiff again, observed a new area of redness and swelling, and recommended medication management until the laboratory and radiologic results returned. Id. at p. 10 of 11. On September 14, 2006, Dr. Craane noted that the Plaintiff's inflammation was resolving, and he directed that the Plaintiff be returned to his normal housing, and that the Plaintiff should notify the staff, at his home medical clinic, if he experienced further problems. Id. at p. 7 of 11. After returning to MCF-Stillwater, the Plaintiff was seen by Dr. Troedson, on September 19, 2006, who noted that the Plaintiff had developed an infection, which was being treated with Cleocin, and that the Plaintiff was feeling a lot better. Id. at p. 11 of 11. Dr. Troedson observed a little swelling, and a little discoloration, and he recommended that the Plaintiff finish his Cleocin regimen. Id. After that entry, there are no medical notes until October 12, 2006, id., and, during 2006 and 2007, the Plaintiff periodically sent kites in which he complained of stomach and leg pain, and was seen by the medical staff, and by Dr. Quanbeck. See, Docket No. 29-2, Exhibit F, at p. 8-11 of 19; Docket No. 29-3, Exhibit G, pp. 5-14 of 14.

Ultimately, after reporting an improvement in his leg pain on February 12, 2008, see, Docket No. 29-3, Exhibit G, at pp. 13 and 14 of 14, the Plaintiff was seen on March 20, 2008, at the HealthEast facility, by Dr. Jack Drogt, Dr. Gary Knudsen, and Ricky Chan, who is a Certified Physician's Assistant, to whom the Plaintiff related that he had experienced increasing pain, swelling, flu-like symptoms, and a low-grade fever, for about one (1) week, that he had informed prison officials of his symptoms on or about March 18, 2008, but that he had also experienced a "deep itch" in his leg for several months. See, Medical Records, Docket No. 29-1, Exhibit D, at p. 3 of 11; Medical Records, Docket No. 29-2, Exhibit F, at p. 2 of 19; Medical Records, Docket No. 29-4, Exhibit H, at p. 2 of 20. After multiple examinations, tests, and preliminary assessments, the Plaintiff was diagnosed with osteomyelitis and, on March 29, 2008, the Plaintiff underwent the second of two (2) surgeries, to drain, debride, and ream, the infected bone and tissue. See, Medical Records, Docket No. 29-4, Exhibit H, at pp. 5-7 of 20.

The Defendant remained at the HealthEast facility, from March 20, 2008, to

(continued...)

For relief, the Plaintiff seeks one million dollars as compensation for mental and physical damages, and injunctive relief, in the form of an Order which directs the Defendants to implement a new set of guidelines for the treatment of chronically ill prisoners, in order to provide for improved follow-up care, even when a prisoner is transferred between facilities. In addition, the Plaintiff requests that the Defendants be held accountable, by the inclusion of "sanctions in their employment file[s]." Id. at pp. 3, 7, and 8 of 10.[9]

---

[8](...continued)
April 8, 2008, and at his discharge, he had diagnoses of osteomyelitis, with infected hardware, reactive thrombocytosis, anemia associated with ostemyelitis, abnormal liver enzymes, related to the acute infection, and stress-induced esophagitis. See, Medical Records, Docket No. 29-3, Exhibit G., at p. 2 of 14. The recommendations were to discharge the Plaintiff to the MCF-OPH transitional care unit ("TCU"), evaluate for physical therapy and occupational therapy, remove his staples on April 15, 2008, and perform weekly blood tests to monitor his platelets, sedimentation rate, and "CRP." Id. at p. 3 of 14. The Plaintiff remained at the TCU, under the care of Dr. Craane, from April 8, 2008, until some time after April 14, 2008. See, Medical Records, Docket No. 29-4, Exhibit H, at pp. 9-10 of 20.

[9]The Defendants appear to read the Plaintiff's Amended Complaint to seek retrospective relief, other than damages. See, Defendants' Memorandum in Support of Motion ("Defendants' Memo"), Docket No. 32, at p. 5 of 8 ("[T]o the extent that Plaintiff's requested equitable relief may be retroactive * * *."). We read the Plaintiff's request for relief as seeking only monetary damages, and prospective equitable relief, in the revision of DOC policies, and therefore, we do not address any issues of retrospective equitable relief here.

In their Motion to Dismiss and for Summary Judgment, Fabian and Paulson contend that the Plaintiff's claims are barred, because Section 1983 does not provide for official capacity claims against public officials; are barred by the immunity afforded by the Eleventh Amendment to State Defendants, in their official capacities, against the recovery of damages and/or retroactive relief; and are also barred by the exhaustion doctrine, as the Plaintiff has failed to exhaust his remedies, by failing to properly grieve his complaints to prison authorities, through the DOC formal grievance process, as is required by the Prison Litigation Reform Act of 1995 ("PLRA"), Title 42 U.S.C. 1997e. See, Defendants' Memorandum in Support of Motion ("Defendants' Memo"), Docket No. 32.

In support of their Motion, the Defendants have submitted the Affidavit of Kim Ebeling ("Ebeling"), who is an Office and Administrative Specialist Senior with the Policy and Legal Services Division of the DOC. See, Affidavit of Kim Ebeling ("Ebeling Aff."), Docket No. 33, at p. 1¶1. Ebeling avers that, pursuant to the DOC grievance procedure policy, which is DOC Policy 303.100, prisoners are generally required to send informal intraprison communications, which are called "kites,"[10] to

_____

[10]A kite is "a printed form issued by the department that offenders use to communicate with staff (e.g., ask questions, communicate concerns, request a special

the person or persons involved in the relevant decision, and then, if the prisoners receive responses with which they are dissatisfied, they must follow up with subsequent kites, progressing through the chain of command. Id. at p. 1¶2, and Exhibit A at pp. 1, 6, 10, 14, 18, 22, and 26 of 32 (DOC Policy 303.100, with various effective dates). After completing the informal kite procedure, if the prisoner is still dissatisfied, he can file a formal grievance with the facility's grievance coordinator, which the Warden, or a designated official, will decide. Id. at p. 2¶2 and Exhibit A at pp. 2, 7, 11, 15, 19, 23, and 27 of 32.

The final step is an appeal to the Commissioner of Corrections, the Assistant Commissioner, or the Deputy Commissioner, and the decision of whichever official responds is considered final. Id. and Exhibit A at pp. 3-4, 8-9, 12-13, 16-17, 20-21, 24-25, and 28-29 of 32. In those cases where a prisoner fears that he may suffer retaliation, if he follows the step-by-step procedure through the chain of command, he can file his grievance directly with the DOC's Central Office. Id. and Exhibit A at pp. 3, 8, 12, 16, 20, 24, and 28 of 32.

---

[10](...continued)
visit, request for program information, request for information to transfer, etc.)," and "[a] kite form can be used to request appointments, information, programming, or to informally resolve an issue." DOC Policy 303.100 Effective 6/2/09, Docket No. 33-1, at p. 1 of 32.

Ebeling avers that the Plaintiff's allegation, that he did not receive appropriate or adequate medical care during his incarceration, is one (1) of the types of complaints to which Policy 303.100 applies, but that the Plaintiff has not filed a grievance at MCF-Lino Lakes, where he is currently incarcerated, at any other facility where he has been housed, or with the Central Office. Id. at p. 2¶3.

In response to the Defendants' Motion, the Plaintiff has submitted his own Affidavit, in which he attests that he complained about his treatment, before his surgery of September 5, 2006, through kites to Dr. Burkholder, to Connor, to Health Services, and to Paulson. See, Affidavit of Jason Tope ("Tope Aff."), Docket No. 47, at pp. 1-2 of 3.[11] The Plaintiff attests that he sent many more kites to Health Services, and to Connor, and that Dr. Burkholder informed him that he could not appeal the decisions of the Health Services staff any higher than Paulson, which is why the Plaintiff contacted the American Civil Liberties Union. Id. at p. 2 of 3. In his

[11]The Plaintiff's Exhibits demonstrate that the Plaintiff sent a number of kites, in which he complained of pain in his leg and stomach, beginning on February 19, 2005, and continuing to April 20, 2005, see, Kites, Docket No. 29, Exhibit A, at pp. 3-5, 6-8, and 10 of 24, and again, from May 8, 2006, to June 18, 2006, id. at pp. 11-16 of 24, and from April 11, 2007, to May 25, 2007, which related to stomach pain, see, Kites, Docket No. 29-3, Exhibit G, at pp. 8-12 of 14, and from April 12, 2009, to May 28, 2009, which were related to a follow up for a nodular infiltrate in his chest. See, Kites, Docket No. 29-4, Exhibit H, at pp. 18-20 of 20.

Affidavit, the Plaintiff refers to the Exhibits that he submitted in support of his averments, with respect to his complaints, id. at p. 2 of 3, and he has also submitted an Orientation Packet which, he asserts, that he received upon his arrival at MCF-Lino Lakes, and which contains no procedures for medical concerns other than a "sick call," and that prisoners are to follow the posted chain of command, which the Plaintiff has also submitted for MCF-Lino Lakes, and that the chain of command does not discuss a grievance procedure. Id. at p. 3 of 3.

With the foregoing factual and procedural backdrop, we turn to consider the merits of the parties' Motions.

## III.  Discussion

A.    Standard of Review.  Since both parties have submitted evidence, with respect to the Defendants' Motion, we evaluate the alternative nature of the Motion -- that is, either for dismissal, or for Summary Judgment -- as a Motion for Summary Judgment.  See, Rule 12(d), Federal Rules of Civil Procedure ("If * * * matters outside the pleadings are presented to and not excluded by the court, the motion [to dismiss] must be treated as one for summary judgment under Rule 56."); see also, BJC Health Sys. v. Columbia Casualty Co., 348 F.3d 685, 687-88 (8th Cir. 2003)("matters outside the pleadings" are written or oral evidence that provides substantiation for the claims and defenses, and does not simply reiterate the pleadings).

Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations.  See, Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1118 (8th Cir. 2006), citing Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 711 (8th Cir. 2004), cert. denied, 544 U.S. 977 (2005).  Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving

party, and we have found no triable issue. See, <u>Smutka v. City of Hutchinson</u>, 451 F.3d 522, 526 (8th Cir. 2006), citing <u>Mayer v. Nextel W. Corp.</u>, 318 F.3d 803, 806 (8th Cir. 2003), cert. denied, 540 U.S. 823 (2003); <u>Eide v. Grey Fox Technical Servs. Corp.</u>, 329 F.3d 600, 604 (8th Cir. 2003); <u>Philip v. Ford Motor Co.</u>, 328 F.3d 1020, 1023 (8th Cir. 2003).

For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Planned Parenthood of Minnesota/South Dakota v. Rounds</u>, 372 F.3d 969, 972 (8th Cir. 2004); <u>Fenney v. Dakota, Minnesota & Eastern R.R. Co.</u>, 327 F.3d 707, 711 (8th Cir. 2003).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." <u>Rule 56(e), Federal Rules of Civil Procedure</u>; see also, <u>Anderson v. Liberty</u>

Lobby, Inc., supra at 256; Eddings v. City of Hot Springs, Ark., 323 F.3d 596, 602 (8th Cir. 2003).

Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir. 2005); Mercer v. City of Cedar Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Sallis v. University of Minnesota, 408 F.3d 470, 474 (8th Cir. 2005); Davis v. U.S. Bancorp, 383 F.3d 761, 768 (8th Cir. 2004); Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995).

B.     Legal Analysis. The Defendants have raised three (3) separate grounds for the dismissal of the Plaintiff's claims. We find that the Plaintiff's failure to exhaust his grievance remedies is dispositive, and we recommend dismissal of the Amended Complaint on that basis.

1.    Standard of Review.    Prisoners are required to exhaust all "available" remedies before seeking relief under Section 1983.  See, Woodford v. Ngo, 548 U.S. 81, 85 (2006).  Accordingly, the PLRA does not require the exhaustion of all remedies, but only those that are available.  See, Title 42 U.S.C. Section 1997e(a); Boyles v. Park, 111 Fed.Appx. 861, 861 (8th Cir. 2004); Johnson v. Jones, 340 F.3d 624, 626-27 (8th Cir. 2003); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001).  Our Court of Appeals has defined "available" as "capable of use for the accomplishment of a purpose; immediately utilizable, * * * accessible."  Miller v. Norris, supra at 740, citing Webster's Third New International Dictionary, at 150 (1986).  However, prisoners must exhaust any available administrative procedures, even if the relief sought, such as monetary damages, is not available.  See, Johnson v. Jones, supra at 627, citing Porter v. Nussle, 534 U.S. 516, 524 (2002);  Lyon v. Vande Krol, 305 F.3d 806, 808 (8th Cir. 2002), citing  Booth  v. Churner, 532 U.S. 731, 737-41 (2001).

Furthermore, it does not matter whether the prisoner may have subjectively believed that there was no point in pursuing his administrative remedies.  See,  Lyon v. Vande Krol, supra at 809; Chelette v. Harris, 229 F.3d 684, 688 (8th Cir. 2000), cert. denied, 531 U.S. 1156 (2001).  If exhaustion is not complete by the time of the filing

- 16 -

of the prisoner's Complaint, then dismissal is mandatory. See, Johnson v. Jones, supra at 627. In our Circuit, prisoners have only been excused from complying with the administrative procedures, when correctional officials have prevented prisoners from utilizing the procedures, or when the officials themselves have failed to comply with the administrative procedures. See, Gibson v. Weber, 431 F.3d 339, 341 (8th Cir. 2005), citing Miller v. Norris, supra at 740; Foulk v. Charrier, 262 F.3d 687, 697-98 (8th Cir. 2001).

In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court considered the role that a prisoner's failure to exhaust his administrative remedies should play in the context of deciding the merits of a claim, which is brought under Section 1983. The Court began its analysis by noting that requiring prisoners to exhaust their administrative remedies had the positive effect of allowing prison officials "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court," which, in turn, "has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record." Id. at 204, citing Woodford v. Ngo, supra at 94-95.

Those purposes served as the backdrop to the Court's consideration of the exhaustion requirement, that Congress included in the PLRA, which provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Title 42 U.S.C. §1997e(a).

The Court first considered whether exhaustion, which is "mandatory under the PLRA," is a pleading requirement that must be satisfied by the prisoner in his Complaint, or if it must be pled, and proved, by the defendant. See, Jones v. Bock, supra at 211, citing Porter v. Nussle, supra at 524.

After noting that the drafters of the PLRA failed to impose a stringent pleading requirement on prisoners, the Court concluded that the "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Id. at 216. The Court further clarified that Courts, which are charged with determining exhaustion, should do so on a case-by-case basis, with each prisoner's Complaint being evaluated in the light of its compliance with established prison grievance procedures. Id. at 218.

2.    <u>Legal Analysis</u>.    The Defendants have submitted competent evidence, in the form of Ebeling's Affidavit, that the DOC, and the facilities at which the Plaintiff was incarcerated -- MCF-Stillwater, MCF-OPH, and MCF-Lino Lakes -- have a formal grievance procedure, which requires that prisoners first send informal grievances, through the kite system, up the chain of command, and then send formal grievances, on the appropriate Offender Grievance forms, up the chain of command, until a decision has been rendered by the Commissioner, the Assistant Commissioner, or the Deputy Commissioner.   See, <u>Ebeling Aff.</u>, supra at p. 2¶2 and Exhibit A.   In addition, the Defendants have submitted competent evidence that the Plaintiff did not submit any formal grievances, which were related to his medical care, or were related to any other problems, at any of the facilities where he has been incarcerated.  <u>Id.</u> at p. 2¶3.

In response to the Defendants' evidence, the Plaintiff has submitted his own Affidavit, in which he does not contest that he did not complete the formal grievance process, but instead, he avers that the Orientation Packet, which he received when he first arrived at MCF-Lino Lakes, and which he has submitted for our review, see, <u>Docket No. 44</u>, at pp. 1-7 of 9, contained a section devoted to medical issues, but that the section provided for nothing more than asking for a medical appointment, and that

the Orientation Packet generally provided that prisoners were required to follow the posted chain of command, which the Plaintiff has also submitted for MCF-Lino Lakes, and which does not mention the formal grievance procedures. Id. at pp. 8-9 of 9. In addition, the Plaintiff attests that Dr. Burkholder informed him that Dr. Paulson had the final word as to his medical care and, as a consequence, the Plaintiff believed that he had done all he could, by sending kites to Dr. Paulson, which is why he contacted the ACLU in 2006.

The Defendants have submitted the Plaintiff's Status History Report, which demonstrates that the Plaintiff was admitted to the custody of the DOC on May 6, 2003, and was initially incarcerated at the St. Cloud facility; that he was then moved to MCF-Stillwater; that he was briefly transferred to MCF-OPH twice, but returned to MCF-Stillwater; and that he was then transferred to MCF-Lino Lakes on November 21, 2008, see, Status History Report, Docket No. 33-1, Exhibit B, at pp. 31-32, which was more than two (2) years after the surgery which he alleges should have occurred earlier, and related to which his infection developed, and was several months after the surgery, in March of 2008, to treat that infection. As a result, even though the Plaintiff contends that he was not provided notice of the formal grievance procedures at MCF-Lino Lakes, he has failed to allege, or to demonstrate, that he was not

afforded notice of the DOC's formal grievance procedures, at MCF-Stillwater, or MCF-OPH, where he was incarcerated at the time of the events which gave rise to his claims here, or even before that time.

In their Reply, the Defendants recognize that the Plaintiff appears to argue that he was not provided notice of the grievance procedures, but respond that, even if he was not provided that notice, that failure is immaterial because, assertedly, prison officials are not required to provide notice of the grievance procedures before they can plead the affirmative defense of a failure to exhaust, and exhaustion can only be excused when prison officials prevent that exhaustion. See, <u>Reply, Docket No. 48</u>, at p. 4 of 5.

The Eighth Circuit has held that a prisoner's subjective beliefs, or understandings, with respect to a prison grievance system, has no effect on the exhaustion requirement of the PLRA, because the PLRA "says nothing about a prisoner's subjective beliefs, logical or otherwise, about the administrative remedies that might be available to him." Rather, the statute provides that, "[i]f administrative remedies are available, the prisoner must exhaust them." <u>Chelette v. Harris</u>, supra at 688. Moreover, as we have noted, the Supreme Court has held that a prisoner must

fully comply with the prison's procedures, in order to adequately exhaust his administrative remedies. See, Woodford v. Ngo, supra at 84, 90-91.

There is a split among the District Courts and Circuit Courts, with respect to whether an administrative remedy is "available," when the prisoner has no notice of the procedures related to that remedy, and Chelette v. Harris, supra, which is focused on subjective knowledge, rather than objective notice, is not squarely on point. Several Courts have held, as the Defendants urge, that, because the Courts may not read exceptions into the exhaustion requirement of the PLRA, a prisoner is not excused from his failure to exhaust, simply because no one ever told him that a grievance system was in place. See, Twitty v. McCoskey, 226 Fed.Appx. 594, 596 (7th Cir. 2007)[unpublished]("A prisoner's lack of awareness of a grievance procedure * * * does not excuse compliance," and, because there was "no suggestion * * * of any affirmative misconduct on the part of the jail to prevent [the plaintiff] from learning about and pursuing the grievance procedure," the plaintiff "bore the responsibility of taking the appropriate steps to comply with the proper procedure."); Brock v. Kenton County, KY, 93 Fed.Appx. 793, 797 (5th Cir. 2004)[unpublished]; Gonzales-Liranza v. Naranjo, 76 Fed.Appx. 270, 272 (10th Cir. 2003) [unpublished] ("[A]ny factual dispute * * * as to whether or not plaintiff was ever advised or

informed of the prison's grievance procedures was not relevant."); Yousef v. Reno, 254 F.3d 1214, 1221 (10th Cir. 2001)(exhaustion was not excused because the plaintiff was not informed by the Assistant Attorney General that the prison had a formal grievance procedure); Albino v. Baca, 2010 WL 883856 at *5 (C.D. Cal., March 10, 2010)("Plaintiff's lack of awareness of jail grievance procedures does not excuse his admitted failure to exhaust administrative remedies prior to bringing suit.").

Other Courts have held that, where a prison grievance system is "unknown and unknowable" to a prisoner, that system is not "available" for purposes of the PLRA exhaustion requirement, and that, therefore, the defendants must show that they apprised the plaintiff of the grievance procedures. See, Goebert v. Lee County, 510 F.3d 1312, 1322, 1323 (11th Cir. 2007)(the prison grievance procedures, which were described in a manual that was provided only to staff, were not "available"); Arnold v. Goetz, 245 F. Supp.2d 527, 537-38 (S.D.N.Y. 2003); Russell v. Unknown Cook County Sheriff's Officers, 2004 WL 2997503 at *3 (N.D. Ill., December 27, 2004); Davis v. Milwaukee County, 225 F. Supp.2d 967, 976 (E.D. Wis. 2002)(absence of materials at the jail related to the grievance procedure prevented the prisoner from knowing how to exhaust); Hall v. Sheahan, 2001 WL 111019 at *2 (N.D. Ill., February 2, 2001)("An institution cannot keep inmates in ignorance of the grievance

procedure and then fault them for not using it," and "[a] grievance procedure that is not made known to inmates is not an 'available' administrative remedy.").[12]

Further, Courts in our District, and elsewhere, have held that, where "the record shows that a prisoner has notice of grievance procedures but that the prisoner has not used them, and there is no indication that prison officials impeded or violated the procedures, there is sufficient proof to grant summary judgment for failure to exhaust," Mussehl v. Fletcher, 2008 WL 312777 at *3 (D. Minn., February 1, 2008); Becerra v. Symmes, 2010 WL 489513 at *2 (D. Minn., February 4, 2010), which reveals that notice of a grievance procedure is relevant to whether a remedy is "available" under the PLRA. See also, Hahn v. Armstrong, 2010 WL 575748 at *4 (E.D. Mo., February 11, 2010)(the plaintiff's allegation, that he asked the guards what to do about his complaint, and that they failed to inform him of the grievance

---

[12]Russell v. Unknown Cook County Sheriff's Officers, Davis v. Milwaukee County, and Hall v. Sheahan, were decided before the Seventh Circuit's unpublished opinion in Twitty v. McCoskey, which, subsequently, has only been cited by District Courts within that Circuit, in cases where the grievance information was "publicly available," Shesler v. Carlson, 2010 WL 2803091 at *5 (E.D. Wis., July 15, 2010), and where a prisoner was confused about a grievance procedure, but was generally aware of it. See, Newbon v. Nehls, 2010 WL 545875 at *3 (E.D. Wis., February 12, 2010). After the Seventh Circuit's decision in Twitty v. McCloskey, which was not published, it seems likely that Russell, Davis, and Hall have only limited persuasive value.

procedures, was insufficient to defeat Summary Judgment, because the Plaintiff failed to allege that he requested grievance forms, or that he was unaware of the procedures).

Even Courts that have held that a prisoner's subjective knowledge is immaterial -- which is the rule in our Circuit -- have concluded that objective notice of the grievance procedure is still a relevant consideration. See, <u>King v. Iowa Dept. of Corr.</u>, 598 F.3d 1051, 1053 (8th Cir. 2010)(finding that an inmate had failed to exhaust, when he failed to appeal his grievance, even though the response form advised him of his right to appeal); <u>Lyon v. Vande Krol</u>, supra at 809 ("There is no question in this case that there was [a grievance procedure], that [the Plaintiff] was aware of it, and that he chose not to follow the steps that the procedure outlined," and the plaintiff "was never told that there was not a procedure."); <u>Frentzel v. Boyer</u>, 2007 WL 1018663 at *5 (E.D. Mo., March 29, 2007)(the plaintiff "submitted sufficient evidence to raise a genuine issue of material fact as to whether he has exhausted available remedies, as he alleges he was prevented from utilizing the Jail's grievance procedure because he was not provided with a copy of the Jail Handbook or otherwise informed of the existence of the procedure," and distinguishing <u>Chelette v. Harris</u>, supra, because in that case, "there was no evidence that the prisoner plaintiff did not know and was not informed of the existence of administrative remedies."); see also, <u>Ruggiero v. County</u>

of Orange, 467 F.3d 170, 178 (2nd Cir. 2006)(the plaintiff's allegation, that he was not

provided with the inmate handbook until after the relevant events, was insufficient,

because he did not allege that he was unaware of the grievance procedures, and

because he did not allege that prison officials took action to prevent him from filing

a grievance); Graham v. County of Gloucester, Va., 668 F. Supp.2d 734, 739 (E.D.

Va. 2009) ("The evidence in the case shows that Plaintiff undisputably had knowledge

of the existence of grievance system at the Jail, and he had clearly been advised that

he could ask questions about procedures and request any needed forms."); Hinton v.

Corrections Corp. of America, 623 F. Supp.2d 61, 64 (D.D.C. 2009)(dismissing the

action for failure to exhaust, where the plaintiff had filed previous grievances, had

received an inmate handbook which summarized the grievance process, and had other

means of informing himself of the grievance procedures).

The Eighth Circuit has explained, in case that is similar to this one, as follows:

> Appellants do not now argue that the Guide's grievance
> procedures were not applicable to medical claims.  They
> argue instead that the Guide's procedures were not
> available to them because unnamed prison and healthcare
> personnel had "made it clear" to them that they should
> voice all complaints regarding medical care informally to
> medical personnel. * * *
>
> We have only excused inmates from complying with an

institution's grievance procedures when officials have prevented prisoners from utilizing the procedures, see Miller v. Norris, 247 F.3d 736 (8th Cir. 2001), or when officials themselves have failed to comply with the grievance procedures. See, Foulk v. Charrier, 262 F.3d 687 (2001). An inmate's subjective belief that the procedures were not applicable to medical grievances "does not matter" and is not determinative. Lyon v. Vande Krol, 305 F.3d 806, 809 (8th Cir. 2002).

Appellants have presented no evidence that any prison official thwarted any attempts to initiate the procedures or that any official made it impossible for them to file grievances. See Chelette v. Harris, 229 F.3d 684, 688 (8th Cir. 2000). Moreover, the Guide explained the applicable grievance procedure and its application to all aspects of inmate life, and appellants admit they received a copy of it.

Gibson v. Weber, supra at 341.

We find that the principles concerning the strict enforcement of the PLRA's exhaustion requirement, as espoused by the Eighth Circuit in Gibson v. Weber, Chelette v. Harris, and Lyon v. Vande Krol, as well as by the Supreme Court in Jones v. Bock, Booth v. Churner, and Woodford v. Ngo, obligate us to hold the Plaintiff to that exhaustion requirement, absent some showing, by him, that the Defendants either took affirmative action to prevent him from utilizing the grievance procedures, see, e.g. Hanks v. Prachar, 2009 WL 702177 at *10 (D. Minn, March 13, 2009), "made it impossible for him to file a grievance," Gibson v. Weber, supra at 341, or made the

grievance system otherwise "[in]accessible," see, <u>Miller v. Norris</u>, supra at 740, for example, by creating a grievance program that was kept secret from the prisoners. See, <u>Lyon v. Vande Krol</u>, supra at 809 (finding significant the fact that the plaintiff "was never told that there was not a procedure."); see also, e.g., <u>Goebert v. Lee County</u>, supra at 1322.

We recognize that the Defendants bear the burden of pleading and proving exhaustion, as an affirmative defense, but we view the Plaintiff's attempt to excuse his failure to exhaust, in this particular case, as akin to an affirmative defense to the Defendants' affirmative defense. Here, the Plaintiff has not competently demonstrated -- nor even alleged -- that he received no notice of the grievance procedure -- as detailed in the Policy provisions that the Defendants have submitted to the Court, and which have every appearance of being publicly available documents. See, <u>Hahn v. Armstrong</u>, supra at *4 (allegations that prison officials did not affirmatively instruct the plaintiff to file grievances were insufficient to raise a fact question, because the plaintiff failed to allege that he was unaware of the procedures); <u>Ruggiero v. County of Orange</u>, supra at 178 (allegations that the plaintiff did not timely receive the inmate handbook were insufficient, because he did not allege that he did not know about the grievance procedures, or that prison officials took action to prevent him

from using them); <u>Shesler v. Carlson</u>, 2010 WL 2803091 at *5 (E.D. Wis., July 15, 2010)(where the grievance procedures were publicly available, "a prisoner's lack of awareness of a grievance procedure does not excuse non-compliance."); cf., <u>Frentzel v. Boyer</u>, supra at *5 (finding a genuine fact issue, where the plaintiff had averred that he was not provided a handbook, or otherwise informed of the existence of grievance procedures).

The fact that a list of the "chain of command," and a single Orientation Packet for a particular Unit, which the Plaintiff received after the events of which he now complains, and which references other policies -- for example, the "Offender Discipline Regulations (ODR) handbook," the "Informal Sanctions Policy," the "Loss of Privileges Policy," and the "unit and program rules" -- do not contain a description of the grievance procedure, does not raise a reasonable inference that the Plaintiff could not, with reasonable effort, have learned of those procedures, and followed them -- particularly where the kite forms, that he filled out, contained a check-box for "informal grievance," which suggests the existence of a formal grievance procedure. In short, there is nothing, here, to suggest that the grievance procedures were hidden from the Plaintiff, or that the prison officials took other action to deny the Plaintiff access to those procedures, so as to excuse his failure to exhaust. See, e.g., <u>Brown v.</u>

Sikes, 212 F.3d 1205, 1207-08 (11th Cir. 2000)("[A] grievance procedure that requires a prisoner to provide information [such as the name of an aggressor] he does not have **and cannot reasonably obtain** is not a remedy that is 'available' to the prisoner")[emphasis added]; Hall v. Sheahan, supra at *2 ("[A]n inmate may not close his eyes to what he reasonably should have known."); cf., Goebert v. Lee County, supra at 1322 (the Record demonstrated that the relevant rules were only available to prison staff).[13]

In so finding, we make explicit, that we are not convinced by the Defendants' argument, that prison officials are not required to provide prisoners with some sort of notice of the existence of grievance procedures, in order for those procedures to be "available" under the PLRA. Rather, we find that, on the Record before us, and taking

---

[13] We also find that the Plaintiff's argument, that he should be excused from the exhaustion requirement because Dr. Burkholder told him that Paulson made the final decision, and that he could not "appeal [his] medical issues any higher than the D.O.C. Medical Director," to be foreclosed by the holdings of the Eighth Circuit. See, Lyon v. Vande Krol, 305 F.3d 806, 809 (8th Cir. 2002)(a statement made to the plaintiff, in response to his informal memo, that the decision was made by an outside consultant, and not prison personnel, was "at best, a prediction that [the plaintiff] would lose," but was "not a denial of [the plaintiff's] right to complain, nor could the statement have misled him about the availability of the [grievance] procedure."); see also, Chelette v. Harris, 229 F.3d 684, 688 (8th Cir. 2000)(a prisoner's subjective belief, that he had sufficiently followed the grievance procedures, was immaterial), cert. denied, 531 U.S. 1156 (2001).

the evidence in the light most favorable to the Plaintiff, there is no genuine, material issue, as to whether the Plaintiff had sufficient notice of the Policy provisions, where there is nothing to so much as intimate that Policy 303.100 was hidden from prisoners, or was otherwise inaccessible, and when the Plaintiff has neither alleged, nor proved, that the Policy was not made available to him, that he was not generally aware that there was a grievance system, or that any prison officials took any affirmative action to prevent him from utilizing those procedures. See, Hanks v. Prachar, supra at *10 (finding that the fact that the plaintiff had been told that his concerns were not grievable would not have been sufficient, standing alone, but combined with testimony, that prison officials returned the plaintiff's grievances, raised a fact question as to the question of exhaustion).

In sum, the Record demonstrates that the Plaintiff failed to exhaust all available remedies, with respect to the claims that he has raised here, and we recommend that the action be dismissed, without prejudice, as a result.[14] See, Chelette v. Harris, supra

---

[14]We also note that, according to the DOC website, which permits public searches for prisoners, as of June 29, 2010, the Plaintiff was released from custody, and is now under supervised release. We printed the record on July 27, 2010, and have included it in our work file. See also, Defendants' Memo, Docket No. 32, at p. 2 of 8 ("Plaintiff has an anticipated supervised release date of June 29, 2010), and Status History Report, Docket No. 33-1, Exhibit B, at p. 31 of 32. As a consequence,

(continued...)

at 688 (where a prisoner has failed to exhaust, the "complaint must be dismissed.");

Johnson v. Jones, supra at 627.

NOW, THEREFORE, It is --

---

[14](...continued)
even if the Plaintiff had not failed to exhaust his administrative remedies, it would appear that the Plaintiff's request for injunctive relief is moot. See, Keeling v. Corrections, 2009 WL 2568675 at *1 (D. Minn., August 18, 2009), citing Pratt v. Corrections Corp. of America, 267 Fed.Appx. 482, 482 (8th Cir. 2008)[unpublished] and Smith v. Hundley, 190 F.3d 852, 855 (8th Cir. 1999)(when a plaintiff is transferred to another facility, and is no longer subject to the conditions which he seeks to have changed in his lawsuit, injunctive relief is moot); see also, Walker v. Bowersox, 526 F.3d 1186, 1189 (8th Cir. 2008)(same).

Further, the Eleventh Amendment bars the Plaintiff's request for damages against Paulson and Fabian, in their official capacities, and against the Medical Services Unit, as a State entity, and so, even if the Plaintiff had exhausted his administrative remedies, those claims could not survive. See, Hadley v. North Arkansas Community Technical College, 76 F.3d 1437, 1438 (8th Cir. 1996)(in a Section 1983 action, State Agencies and officials may invoke Eleventh Amendment immunity, if the practical result of a suit would result in a Judgment against the State itself), cert. denied, 519 U.S. 1148 (1997); Edelman v. Jordan, 415 U.S. 651, 676-77 (1974)(suits for damages against State officials, in their official capacities, are barred); Walker v. Bowersox, supra at 1190 ("[W]e find that the official-capacity claims against these defendants for damages are Eleventh Amendment barred."). As a consequence, the Plaintiff's Motion to Effect Service on the Medical Services Unit is moot, as the injunctive relief, as well as the damages that he seeks from that State entity, are not available to him and, in any case, the Defendants have informed the Court that, had the Medical Services Unit been served, it would have joined in the Motion for Summary Judgment, and the Plaintiff has failed to exhaust his administrative remedies as to all of his claims.

RECOMMENDED:

1.     That the Defendants' Motion for Summary Judgment [Docket No. 31] be granted.

2.     That the Plaintiff's Motion to Dismiss Lynn Dingle and Maureen Connor [Docket No. 41] be granted, but that the Plaintiff's Motion to Effect Service [Docket No. 41] be denied, as moot.

3.     That the action be dismissed, without prejudice, for failure to exhaust administrative remedies.


Dated:  July 29, 2010                           *s/Raymond L. Erickson*
                                                Raymond L. Erickson
                                                CHIEF U.S. MAGISTRATE JUDGE


**N O T I C E**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 12, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply

with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 12, 2010**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.